FILED IN CHAMBERS
U.S.D.C. - Atlanta

AUG 1 4 2015

James N. Hatten, Clerk

By: _____

Deputy Clerk

LORI HENINGBURG,

        Plaintiff,

v.

CSS CORP. and JOHN O. AGULUE,

        Defendants.

CIVIL ACTION NO.
1:13-CV-2184-ODE

## ORDER

This employment action, brought pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., comes before the Court on the parties' cross-motions for summary judgment [Docs. 43, 48]. For the following reasons, Plaintiff's Motion for Partial Summary Judgment [Doc. 43] is DENIED, and Defendants' Motion for Summary Judgment [Doc. 48] is also DENIED.

## I. Background

The following facts are undisputed unless stated otherwise:

Plaintiff Lori Heningburg ("Plaintiff") was hired by CSS Corp. ("CSS") in April 2007 [Pl.'s Statement of Material Facts ("PSMF"), Doc. 43-3 ¶ 47]. Plaintiff alleges that she initially was employed as a staffing coordinator and subsequently served as an administrative assistant and executive administrative assistant [Compl., Doc. 1 ¶¶ 5, 8]. CSS terminated her employment in April 2012, [PSMF ¶ 48], allegedly upon her return from an extended period of medical leave [Compl. ¶¶ 27-30]. Plaintiff subsequently brought this action against Defendant CSS and its President, John O. Agulue ("Agulue") (collectively, "Defendants"), for

interference and retaliation in violation of the FMLA and for failure to pay overtime wages, unlawful deductions from wages, and for retaliation in violation of the FLSA.

The only issue before the Court currently is whether CSS is a "covered employer" under the FMLA [See Docs. 43-1 at 3; 48 at 3]. However, resolution of this issue is not a simple matter. The nub of the "covered employer" issue is whether CSS had more than a certain number of "employees" in the relevant time frame (2011-2012).[1] While CSS admits that it had some employees,[2] it contends it did not have enough employees to meet the statutory threshold.

CSS is a Georgia for-profit corporation that offers in-home personal care and nursing services to the elderly and to those with developmental disabilities [PSMF ¶ 1]. Agulue is the Administrator/CEO and sole owner of CSS [Defs.' Statement of Material Facts ("DSMF"), Doc. 48-1 ¶ 5]. Services to individuals with developmental disabilities (including, for example, intellectual disability) are funded through the State of Georgia's Department of Behavioral Health and Developmental Disabilities, which is a Georgia Medicaid program [Id. ¶ 2]. Services are provided to individuals with non-developmental disabilities (apparently older, infirm persons) through the State of Georgia's

---

[1]See 29 U.S.C. § 2611(4).

[2]Apparently, these employees consisted of office staff, [Dep. of Ugochukwu T. Nwoku ("Nwoku Dep."), Doc. 46 at 27-28], and those working in its adult day care center, [see DSMF ¶ 37]. CSS employed a registered nurse ("RN") as a nurse supervisor [Nwoku Dep. at 29]. CSS asserts that it had a total of 15 employees in 2011 and 29 employees in 2012.

2

SOURCE or Community Care Services Program [id. ¶ 3], also a Medicaid-funded program.

A. CSS's In-Home Healthcare Services

An application for Medicaid-sponsored in-home care services is initiated with the relevant State agency. The agency sends a nurse to determine what services the client requires [DSMF ¶ 6]. The State agency then notifies CSS and other similar providers of the client's name, address, the specific services required, and the hours and days of the week of the assignment [Id. ¶ 7]. It also tells CSS and the other similar providers what gross hourly pay is being offered by the State.[3]

CSS maintains a database of persons who are eligible for assignments i.e., they have obtained the training and certification required by the State and have signed up with CSS. The parties refer to these persons as "Caregivers". It is undisputed that the Caregivers group includes certified nursing assistants ("CNAs"), personal care aides ("PCAs"), and licensed practical nurses ("LPNs") [Id. ¶ 9; Doc. 55 ¶ 9]. However, as discussed below, virtually all of the Caregivers are CNAs. CSS contacts one (or more if necessary) of the Caregivers with information regarding the schedule of the assignment, the location of the client's home, the list of services required, and the hourly pay rate [Id. ¶ 15]. Caregivers can and do accept or reject an assignment for any reason [Id. ¶ 16]. In deciding whether to accept or reject an assignment, workers might consider the hours and frequency of the assignment, distance to the

---

[3]CSS determines what hourly amount to offer to Caregivers.

client's home, the required tasks, the applicable pay rate [id. ¶ 18] or any other facts pertaining to the desirability of the assignment. Further, Caregivers occasionally reject assignments for other reasons, including that they are working on other jobs, going out of town, have conflicts with childcare obligations, or that they simply do not want to take an assignment at that time [Id. ¶ 19].

Caregivers frequently call CSS to ask whether CSS has work available [PSMF ¶ 25]. On rare occasions workers independently obtain their own clients [DSMF ¶ 20]. However, Caregivers need a special license in order to contract directly with clients [PSMF ¶ 34]. CSS maintains no records regarding instances where Caregivers have independently obtained clients and does not know whether they possess the requisite license [Id. ¶ 33; Dep. of Ugochukwu T. Nwoku ("Nwoku Dep."), Doc. 46 at 94-95]. CSS's Contractor Assignment Agreement prohibits Caregivers from becoming employed by or receiving compensation directly from a client of CSS, if the offer of employment from the CSS client comes within six months of when the Caregiver was assigned to that client by CSS [PSMF ¶ 35].

CSS classifies most of its Caregivers as independent contractors [Id. ¶ 7]. Each such Caregiver signs an independent contractor agreement, [DSMF ¶ 12], and is issued a Form 1099 at the end of each calendar year [PSMF ¶ 7]. For the year 2011, CSS issued approximately 208 Form 1099s to Caregivers who provided in-home care to CSS clients [Id. ¶ 8]. For the year 2012, CSS issued approximately 252 Form 1099s to in-home Caregivers [Id.].

4

While virtually all of CSS's Caregivers work in clients' private homes, some provide services in their own homes and some work in group homes.[4] CSS treats all of them as independent contractors.[5]

The parties appear to be in agreement that CSS places a sufficient number of CNAs to provide home care for clients such that the attributes of this group are outcome-determinative on the question whether CSS is a "covered employer" under the FMLA. Therefore, the Court will look no further than the CNA group--as opposed to the Caregivers group as a whole--in addressing the "covered employer" issue. If the members of this group are properly classified as employees, CSS is a covered employer under the FMLA. If the members of this group are properly classified as independent contractors, CSS is not a covered employer under the FMLA.

B.  Services Provided by Certified Nursing Assistants (CNAs) in the Clients' Homes or the CNA's Home

Caregivers generally assist clients with daily activities and personal healthcare needs, including bathing, dressing, grooming, toileting, meal preparation, feeding, minor housekeeping, running errands, and transportation to and from medical appointments [PSMF

---

[4]Several of the group homes in which CSS's caregivers worked were owned and operated by the Clayton Community Services Board; CSS merely provided staffing for those homes [DSMF ¶ 30]. In 2011 and 2012, however, CSS also owned three group homes and leased them to clients who lived in the home and received services from CSS's caregivers [Id. ¶ 32].

[5]CSS operates an adult day care center which employs Caregivers under the supervision of CSS staff. CSS classifies these Caregivers as employees.

5

¶ 3; DSMF ¶¶ 40-41]. In addition to performing the above tasks, a CNA is trained to change incontinent, non-ambulatory individuals; to transfer or transport them (i.e., from a wheelchair to a bed); and to turn them [Nwoku Dep. at 37-38, 42-43].[6] The client's Care Plan specifically establishes what services must be performed [PSMF ¶ 5; DSMF ¶¶ 40, 43]. Obviously, CSS cannot and does not supervise the manner in which CNAs perform these services [DSMF ¶¶ 44-45].

CNAs return an "Aide Weekly Visit Record" to CSS indicating the number of hours worked and tasks performed [Id. ¶ 46; PSMF ¶ 43].[7] CSS compares the Aide Weekly Visit Record to the work required by the Care Plan to make sure that all work required by the Care Plan was performed [Id. ¶ 48].

CNAs are required to work the hours stated in the Care Plan set by the State [PSMF ¶ 15; Defs.' Resp. to PSMF, Doc. 53 ¶ 15].

---

[6]The record indicates that LPNs are more medically skilled than CNAs, [Nwoku Dep. at 35-36], but does not contain a detailed description of the tasks that an LPN would perform.

PCAs perform many of the same tasks that CNAs perform, but they do not transport or turn non-ambulatory clients [DSMF ¶ 41; Nwoku Dep. at 42-43]. PCAs do not have a CNA certificate [Nwoku Dep. at 42-42].

CSS also distinguishes CNAs from home health aides ("HHAs"), who, by contrast, would "receive direct supervision from an RN" and would perform wound care, including the dressing of wounds [Nwoku Dep. at 37-38]. CSS does not use any HHAs to provide services to clients [Id. at 37].

[7]Plaintiff has attached copies of various Aide Weekly Visit Records from 2011 as Exhibit P-25 to the 30(b)(6) deposition of CSS [see Docs. 46-32 through 46-35]. These Records contain a comprehensive list of Caregiver services; the Caregiver checks the boxes denoting the service rendered and the date on which it was performed for the client.

6

They may not hire others to assist them in the performance of their tasks [PSMF ¶ 36].

## C. Pay Arrangements for CNAs

CNAs are paid hourly [Id. ¶ 11].[8] From 2011 to approximately August 2012, Caregivers received an hourly rate of as much as $12.00 per hour [Id. ¶ 37; DSMF ¶ 63]. After August 2012, the hourly rate topped out at $10.00 [PMSF ¶ 37; DSMF ¶ 64]. The record does not state the specific hourly rate for CNAs.

CNAs do not receive time and a half for hours worked in excess of 40 hours per week [PSMF ¶ 38]. They do not receive bonuses if they perform their assigned duties well [Id. ¶ 13]. CSS exacts a chargeback in the amount of two hours' pay if a CNA fails to report to a scheduled assignment without providing sufficient advance notice to CSS [DSMF ¶ 57]. CNAs may be required to compensate the client for any damage caused in the client's home [Id. ¶ 58].[9]

## D. Work for CSS's Competitors

CSS has several competitors who provide services in the same geographical area, and Caregivers who provide services through CSS are free to accept assignments from CSS's competitors [DSMF ¶¶ 76-77]. CSS does not maintain documentation or records regarding

---

[8]Host and group home providers are compensated on a daily flat-rate basis [DSMF ¶ 61].

[9]CSS states that the IRS has communicated with CSS on several occasions regarding its 1099 workers for the purpose of updating certain personal information on file and has never claimed that the Caregivers should be classified as employees [DSMF ¶ 75]. The Court does not consider this in resolving the covered employer issue.

7

Caregivers who provide similar services to CSS's competitors [PSMF ¶ 24]. Nevertheless, CSS estimates that approximately fifty percent of Caregivers accept assignments from its competitors [DSMF ¶ 79].

E.    Alleged State Polices which CSS Implements

CSS provides brochures to CNAs which are entitled as follows: (1) "Orientation - Personal Code of Ethics" form [PSMF ¶ 28]; (2) "Reporting Abuse, Neglect, and Exploitation"; (3) "Workplace Rules and Regulations"; (4) "CNA Workplace Rules and Regulations"; and (5) "Do's and Don'ts." CSS contends that the State requires it to distribute this information; Plaintiff is skeptical that this is correct. This is considered to be a factual dispute between the parties.

The record before the Court does not contain the contract(s) between CSS and the State agencies, assuming such contracts exist. The record only contains a brief Memorandum of Understanding affirming CSS's participation in the SOURCE referral program [Doc. 61-1]. The Memorandum states, among other things, that CSS will provide services in accordance with unspecified SOURCE policies and procedures.

CSS sends a nurse to visit the client's home in the event that the client contacts CSS with a complaint [Id. ¶ 54]. In such cases, CSS may immediately terminate the CNA or issue a warning to the CNA that the contract will be terminated if the CNA fails to abide by it [Id. ¶ 55].

F.    Required Training

CNAs must obtain a CNA certificate at their own expense prior to signing up with CSS [DSMF ¶ 81]. To that end, CNAs must pay

for and complete three to six months of training at a vocational or technical school and must pass state-administered tests [Id. ¶ 82; PSMF ¶ 23].

Likewise, the State of Georgia requires CNAs to obtain CPR training [DSMF ¶ 84]. CNAs are responsible for obtaining a CPR certificate, which is valid for two years and is available through third-party instructors at a cost of $35.00 [Id. ¶¶ 85-87]. Occasionally, CSS brings in a third-party instructor to conduct CPR training, in which case CNAs pay training fees directly to the instructor [Id. ¶ 86].

The State also requires Caregivers to go through a criminal background check and tuberculosis screening, which CNAs must obtain at their own expense [Id. ¶¶ 88-89]. Moreover, the State requires CNAs to complete a certain number of annual in-service training hours [Id. ¶ 90]. CSS offers CNAs access to third-party video and online training, although they may complete their required hours with other providers [Id. ¶¶ 92-93]. CNAs are responsible for ensuring that they have completed the required number of in-service hours; nevertheless, CSS does monitor its Caregivers' in-service hours to ensure compliance with State requirements [Id. ¶ 95]. CNAs are not compensated for time spent completing in-service training hours [Id. ¶ 96].

G. Supplies and Operating Equipment

CNAs are required to provide their own transportation to and from assignments, including insurance, and are not reimbursed for transportation expenses or costs due to vehicle damage [Id. ¶¶ 97-98]. They are not required to wear a uniform [id. ¶ 105] but must provide at their own cost gloves, scrubs, rubber-soled shoes,

9

masks, and mouthpieces for CPR, as well as stethoscopes, thermometers, and a tape measure [Id. ¶¶ 99-100; PSMF ¶ 16].[10]

CSS's office equipment includes at least twenty computers, four copiers, and some number of printers, fax machines, ink cartridges, and telephone lines. The most expensive equipment used by clients--such as wheelchairs or oxygen tanks--is purchased by the clients or their insurance company, and not by CSS or the CNAs [Id. ¶ 22; DSMF ¶ 106].

## II. **Procedural History**

On June 28, 2013, Plaintiff brought this action against Defendants CSS and Agulue in the Northern District of Georgia. Defendants each filed an Answer and Affirmative Defenses in response to Plaintiff's Complaint. Defendant CSS alleged, moreover, that "Plaintiff's Complaint is barred to the extent CSS is not a covered employer under the FMLA" [Doc. 7 at 14]. Consequently, the parties stipulated in their Joint Preliminary Report and Discovery Plan to bifurcate discovery such that the first phase concerned only the issue whether CSS is a covered employer under the federal statute. The first phase of discovery closed on August 15, 2014.

On September 12, 2014, Plaintiff filed a motion for summary judgment, along with a statement of undisputed facts and supporting exhibits, on the issue whether CSS is a covered employer under the FMLA [see generally Doc. 43]. Defendants likewise moved for summary judgment on the issue on September 15,

---

[10]During the 2011-2012 time period, CSS provided gloves at no cost [DSMF ¶ 102; PSMF ¶ 17].

2014 [see generally Doc. 48]. Both parties have responded to the opposing party's motion and have filed responses to the opposing party's statement of undisputed facts.

### III. Legal Standard

The Court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted). Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. Id. at 325.

To be material, a fact must be identified by the controlling substantive law as an essential element of the non-moving party's case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (internal quotation marks and citation omitted). For instance, "[m]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1325-26 (11th Cir. 2005) (citation omitted).

11

In reviewing the record, the district court must construe the facts and make all reasonable inferences in favor of the non-moving party. Anderson, 477 U.S. at 255; Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008). However, "the nonmovant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000).

## IV. **Legal Framework Under the FMLA and FLSA**

The only issue presented in the parties' cross-motions for summary judgment is whether CSS is a covered employer under the FMLA. The following legal framework governs the issue:

### A. Overview of FMLA Coverage

Congress enacted the FMLA in part "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(2). Eligible employees are entitled to twelve weeks of unpaid leave in any one-year period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." Gutter v. GuideOne Mut. Ins. Co., 17 F. Supp. 3d 1261, 1267-68 (N.D. Ga. 2014) (Totenberg, J.) (quoting 29 U.S.C. § 2612(a)(1)(D)) (internal quotation marks omitted). Following FMLA leave, an employer must restore the employee to the same or equivalent position as the employee held prior to leave. Id. at 1268; 29 U.S.C. § 2614(a)(1).

For FMLA purposes, an "employer" is a person or entity "engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or

preceding calendar year." 29 U.S.C. § 2611(4).[11] Because Plaintiff asserts that she was not permitted to return to work in April of 2012, the relevant time frame for the Court's inquiry includes the calendar year 2012--the "current" calendar year--and the calendar year 2011--the "preceding" calendar year.

Whether an entity is a covered employer under the FMLA, then, turns on whether the entity "employs" the requisite number of "employees." The FMLA adopts its definitions of "employ" and "employee" from the FLSA. 29 U.S.C. § 2611(3). Thus, if a worker is classified as an "employee" for FLSA purposes, he may be included in the calculation to determine whether an entity is a covered employer under the FMLA.

The FLSA provides an expansive and rather circular definition of what constitutes an employer-employee relationship. An "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e). For FLSA purposes, "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203(g).

B.    Economic Realities Test

Court decisions have supplied criteria which are used to determine whether a worker is an "employee" or an independent contractor for FLSA purposes. Courts must consider whether the economic reality of the relationship indicates that the worker is economically dependent on the alleged employer. Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961); Scantland v.

_____

[11]The definition of "employer" under the FMLA is narrower than its counterpart in the FLSA. The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

13

Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013); Layton v. DHL Exp. (USA), Inc., 686 F.3d 1172, 1175 (11th Cir. 2012); Freund v. Hi-Tech Satellite, Inc., 185 F. App'x 782, 782-83 (11th Cir. 2006). The label given to the worker is not controlling. Scantland, 721 F.3d at 1311. Rather the Court must determine "whether an individual is in business for himself or is dependent upon finding employment in the business of others." Id. at 1312 (quoting Mednick v. Albert Enters., Inc., 508 F.2d 297, 301-02 (5th Cir. 1975) (internal quotation marks omitted).[12]

In Scantland, the United States Court of Appeals for the Eleventh Circuit endorsed a multi-factor approach to examine the economic realities of an alleged employment relationship. 721 F.3d at 1312. Under this approach, the following six factors guide this Court's inquiry:

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship;

(6) the extent to which the service rendered is an integral part of the alleged employer's business.

---

[12]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding all decisions of the former Fifth Circuit issued on or before September 30, 1981.

14

Id. at 1312. No one factor is determinative, and other factors may be considered. Id. Ultimately, while using the factors "as guides," the Court must focus its inquiry on the economic dependence of the alleged employee. Id.

The Eleventh Circuit has not directly considered whether CNAs who accept home care assignments are employees or independent contractors for FLSA or FMLA purposes. In Scantland, the Eleventh Circuit reversed the lower court's grant of summary judgment to the defendant, an installation and repair service contractor. The plaintiff technicians who performed installation and repair services were required to report to the defendant's facility at a certain time each day, could not turn down assignments, and could not work for other companies. Id. at 1313-14. They worked pursuant to year-term contracts. Id. at 1318. The technicians were subject to "meaningful supervision" and could be charged fines for failing to meet specifications. Id. at 1314-15. Viewing the facts in the light most favorable to the plaintiff technicians and drawing all reasonable inferences in their favor, the Court of Appeals concluded that the technicians were "employees" and not "independent contractors" for FLSA purposes. Id. at 1319.

In Layton v. DHL Express, the Eleventh Circuit held that, under the FLSA, DHL was not an employer of delivery drivers who performed services for DHL. There, DHL had engaged a third-party independent contractor to provide vehicles and employ drivers to deliver DHL's packages. 686 F.3d at 1173. The third-party contractor was responsible for hiring, firing, and paying drivers. Id. at 1181. DHL also played some role in overseeing the drivers'

work. DHL owned the facilities where packages were loaded and inspected drivers' vehicles and uniforms for compliance during the loading process. Id. at 1173-74. During the day, DHL could communicate certain matters to drivers. Id. at 1174. Applying an eight-factor test,[13] the Court concluded that DHL did not control the drivers but merely set "macro-level goals" for them. The drivers spent most of their day away from DHL's facilities, and DHL did not direct the manner in which drivers accomplished their daily tasks. Id. at 1181.

In Freund, an unpublished decision, the Eleventh Circuit upheld the lower court's determination, following a bench trial, that an installer of home satellite and entertainment systems was an independent contractor. The plaintiff installer exercised some control over his schedule and, with a few exceptions, controlled the details of how to go about his duties. 185 F. App'x at 783. The installer could hire additional workers and was compensated by the job, rather than by the hour. Id. He procured all of the necessary equipment and tools to perform installations. Id. at 783-84. Special skills were required to perform proper installations and to troubleshoot difficulties. Id. at 784. The installer could accept jobs from other installation brokers. Id. The Eleventh Circuit held that, under the economic realities test,

---

[13]Layton is a joint-employer case. 686 F.3d at 1175-76. The Eleventh Circuit necessarily employed a different set of factors to address the issue whether a person or entity is a joint employer for FLSA purposes. Id. Those factors focus more heavily on the role played by the alleged joint employer than on the economic dependence of the alleged employee. Nevertheless, Layton is illustrative of the fact-intensive inquiry which is required when assessing employer-employee relationships under the FLSA.

16

the lower court was not required to consider whether the plaintiff installer had in fact taken advantage of the flexibility worked into the installer-broker arrangement. Id.

## V. Discussion

CSS acknowledges that it engaged sixteen workers in 2011 and twenty-nine workers in 2012 whom it classified as "employees." Defendants nevertheless assert that CSS is not an "employer" under the FMLA because Plaintiff has not shown that it engaged 50 employees for each working day during each of 20 or more calendar workweeks in 2011 or 2012. Plaintiff points out that CSS used more than 200 Caregivers (almost all CNAs) to perform health care services in each relevant year. Plaintiff asserts that these workers also are "employees" that must be included in the calculation to determine whether CSS is an "employer" for FMLA purposes. Defendants contend that the CNAs are independent contractors not included within the FLSA definition of "employee."

Two questions are before the Court: (1) whether the CNAs are "employees" under the FLSA; and (2) whether CSS provided assignments to a sufficient number of CNAs in the relevant time frame to meet the FMLA's test. As to the second issue, Plaintiff testified in her sworn declaration that "50 or more CSS Caregivers performed services for CSS clients, for each working day, during each of 20 or more calendar workweeks during [2011 and 2012]" [Decl. of Lori Heningburg, Doc. 44-1 ¶¶ 10-11]. Defendants offer no rebuttal evidence, but contend that the statement is not based on personal knowledge. Regardless, however, her statement does not tie to the CNAs who are the subject of this Order.

17

The question whether a worker is an "employee" is a question of law, Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996), which the Court may decide at the summary judgment stage or, if there are material factual disputes, after a trial. With respect to Plaintiff's motion for summary judgment, she bears the burden to show that the CNAs were employees as a matter of law; with respect to CSS's motion for summary judgment, it bears the burden to show that the CNAs were not employees as a matter of law.

In reviewing the pending motions, the Court will consider the six factors laid out in Scantland, which the parties also cite in their respective memoranda.[14] On summary judgment, moreover, the Court will consider whether there are material factual disputes underlying the individual factors.

A.    Control

The first factor in the economic reality inquiry considers the "nature and degree of the alleged employer's control as to the manner in which the work is to be performed." Scantland, 721 F.3d at 1313. The underlying question is whether the workers reserve sufficient control over their work that they can be considered

---

[14]The Court limits its analysis of the Scantland factors to the CNAs who received Form 1099s from CSS. Although CSS also engaged PCAs and LPNs, it appears that CSS did not engage enough PCAs and/or LPNs to reach the required number of employees under the FMLA. Thus whether the PCAs and LPNs are employees would not dispose of the issue before the Court. Likewise although CSS admits that it classified the CNAs who worked in the adult day-care center as employees (and issued them Form W-2s), this group of CNAs alone is not large enough to satisfy the FMLA calculus. The group of CNAs that received Form 1099s, on the other hand, is sufficiently numerous to satisfy the FMLA calculus if the CNAs are determined to be employees for FLSA purposes.

"separate economic entities who [are] in business for themselves."
Id. (internal quotation marks and citation omitted).

Here, the Court finds that this factor favors an independent
contractor arrangement. The CNAs enjoyed substantial flexibility
in fashioning their own schedules. They were at liberty to accept
or reject assignments from CSS and could work for competing
agencies. Having accepted an assignment, they were subject to
little supervision by CSS. Although the existence of an
employment relationship does not depend on constant oversight by
the employer, the CNAs' work was performed away from CSS's
premises, 90 percent of the time in the client's or the provider's
home. Consequently, CSS was not in a position to exert control
over the performance of the Caregivers' assignments.

It is true that Caregivers did not use their own judgment in
determining which tasks needed to be performed for a client, but
were instead governed by the client's Aide Care Plan. The Aide
Care Plan detailed a schedule of tasks to be completed. To the
extent these Aide Care Plans restricted the Caregivers' judgment,
however, the restriction does not indicate that the Caregivers
were employees of CSS. "[R]equiring a contractor to meet the
client's technical specifications is not the type of 'control'
which bestows 'employee' status on the contractor." Scantland,
721 F.3d at 1315 n.8 (citation omitted). Here, the Aide Care
Plans contained specifications for the client's care. The Plans,
furthermore, were compiled by the State of Georgia, and it was not
within CSS's power to change them.

B. Opportunity for Profit or Loss

The second factor considers whether the worker's exercise of managerial skill creates an opportunity for additional profit or loss. Scantland, 721 F.3d at 1316. The Court finds that several underlying facts are in dispute and therefore cannot determine whether this factor favors Plaintiff's or Defendants' position.

Some facts in this case favor Plaintiff's view. It is undisputed, for example, that CNAs were paid at an hourly rate and received no bonus for performing tasks well. Thus, they could not increase profits for a given assignment by exercising greater than ordinary skill. It is also undisputed that a set number of hours were prescribed for each assignment. In other words, the CNAs could not maximize profits by completing tasks efficiently and leaving an assignment early to take on additional work. These facts are indicative of an employment relationship.

But the relationship between CSS and its Caregivers also bears some similarities to an independent contractor arrangement. For example, CNAs can reduce travel expenses by taking on assignments closer to home. The opportunity to minimize travel costs is perhaps not a traditional profit/loss consideration, but nevertheless indicates that Caregivers could exercise some managerial skill to maximize profits for each assignment.

Several factual disputes prevent the Court from resolving this factor. Specifically, the parties dispute the bargaining power between CSS and CNAs. Although it is undisputed that CNAs can accept or reject assignments for any reason, it is unclear whether these decisions are driven by managerial skill that would

20

lead to additional profit. That is, it is disputed whether Caregivers consider the hours and frequency of an assignment, the distance to the assignment, or the applicable pay rate in determining whether to accept an assignment. Further, although it is undisputed that CNAs can negotiate the rate of pay for an assignment, a question exists as to whether CNAs in fact negotiated and how often they were successful. Defendants' 30(b)(6) deponent estimated that 80 percent of Caregivers negotiated their compensation [Nwoku Dep. at 88-89]. Plaintiff has offered no evidence on this point. Defendants conceded at oral argument that the record contains no documentation of this statistic, and there is no direct evidence from any of the CNAs on this point [Id.]. These are key facts underpinning the economic reality of the relationship between CSS and its Caregivers, including the CNAs. Thus, on summary judgment the Court cannot determine whether the second factor favors an employment relationship or an independent contractor arrangement.

C.   Investment in Equipment or Materials

The third factor considers whether workers make a significant investment in equipment or materials, or are able to employ others to assist them in the performance of their work. Scantland, 721 F.3d at 1317. It is undisputed here that the CNAs are not authorized to hire other workers to assist them. Nevertheless the investment made by the CNAs is sufficient to tip this factor in favor of an independent contractor relationship.

The investment factor is relevant to the inquiry because "workers are more likely to be economically dependent on the person who supplies the equipment." Layton, 686 F.3d at 1181.

21

Here CNAs are responsible for acquiring their own training and on-going education. They must purchase the scrubs, thermometers, and tape measures used in the performance of their assignments. To the extent Plaintiff urges the Court to take a comparative approach--considering both the Caregiver's level of investment and CSS's level of investment in the business--she cites no binding or persuasive authority in support of such an approach. Indeed it appears the Eleventh Circuit has not adopted a comparative approach to this factor. See Scantland, 721 F.3d at 1317 (no mention of comparative analysis); Layton, 686 F.3d at 1176 (deeming it irrelevant to compare the investment of the worker to that of the alleged employer).[15] Here, the Caregivers' investment in training, on-going education, and everyday supplies indicates an independent contractor arrangement.

D.    Special Skill

The fourth factor considers whether the service rendered by the Caregivers requires a special skill. Scantland, 721 F.3d at 1318. On the facts before it the Court finds that this factor weighs neutral in the overall analysis. CNAs possess some skill in that they must complete several months of training. CNAs must also complete sixteen hours of in-service training classes annually. This training is required by the State of Georgia, and the Court therefore assumes that the training confers some level

---

[15]To the extent the Eleventh Circuit used a comparative analysis in Layton, the facts of that case are distinguishable. Layton was a joint employer case, and the Court compared the relative investments in equipment and facilities made by the alleged employer (defendant) and the third-party contractor acknowledged to have hired the plaintiff workers.

22

of skill. But the role of a Caregiver also requires CNAs to perform many tasks that are not covered by their training. Aside from assisting clients with personal healthcare and hygiene needs, Caregivers are required to assist in meal preparation, minor housekeeping, transporting the client to appointments, and running errands [PSMF ¶ 3]. On the whole, the Court finds that the level of skill required of CNAs is a neutral factor in determining whether the Caregivers are employees of CSS.

E.    Permanency and Duration

Under the fifth factor, the Court considers the degree of permanency and the duration of the working relationship between CSS and its Caregivers. Scantland, 721 F.3d at 1318. This factor heavily favors Defendants. The undisputed facts establish that CSS's Caregivers were not engaged in an on-going employment relationship. Rather, the Caregivers sporadically accepted specific assignments of limited duration. CNAs were free to work for competing in-home healthcare companies. CNAs could reject assignments for any reason. It appears that the CNAs and CSS had little or no contact between assignments. Further, the record shows a high rate of turnover in CSS's Caregiver workforce during the relevant time period.

Plaintiff concedes that the CNAs are more transient than typical employees, but argues that transience is intrinsic to the industry and is not an indication of the CNAs' economic independence [Doc. 43-1 at 25 (citing Brock v. Superior Care, Inc., 840 F.2d 1054, 1060-61 (2d Cir. 1988))]. This Court disagrees with Brock's reasoning in that it reads the fifth factor out of the analysis. In addition, and more to the point, CSS has

23

no continuing relationship with the CNAs in its database. The CNAs are in an on-call status in between assignments. There could be long gaps in between assignments. The undisputed facts of this case suggest that the CNAs lacked the "permanence of relationship" that is indicative of an employment arrangement. Scantland, 721 F.3d at 1318.

F.    Integral Part of the Alleged Employer's Business

The sixth factor focuses on the extent to which the service rendered by the CNAs is an integral part of CSS's business. Scantland, 721 F.3d at 1319. On this point the parties agree that the CNAs performed work that is integral to CSS's business [PSMF ¶ 10]. Despite the parties' agreement, the Court finds that this factor is neutral. To be sure, CSS uses CNAs to provide services to persons whom the State has determined are entitled to services. However, it is also appropriate to say that placement services are the core of CSS's business; CSS acts as a placement agency, connecting patients to qualified caregivers. In this regard the case at bar is distinguishable from Scantland, where the defendant telecommunications installation and repair company used plaintiff-technicians to accomplish its installation and repair services. See 721 F.3d at 1319.    Thus, the Court considers this factor neutral.

G.    Final Analysis

On the facts before it, the Court finds that three factors--control, investment, and permanency/duration--favor Defendants' position that the CNAs are independent contractors. Two factors--whether the CNAs are integral to CSS's business and whether the CNAs exercise special skill--are neutral.    Finally, the Court

24

cannot determine on the facts before it whether the profit/loss factor favors an employment relationship or an independent contractor arrangement.

Ultimately, the Court cannot hold as a matter of law at this juncture that the CNAs are employees or independent contractors. Questions of fact remain with respect to the Caregivers' actual ability to negotiate salary rates and the reasons driving CNAs' decisions to turn down assignments from CSS. The relative bargaining power of the CNAs and their exercise of managerial skill are key facts without which the Court cannot resolve the second factor. Without these facts the Court cannot consider the circumstances of the activity as a whole and therefore cannot decide as a matter of law whether the CNAs were employees or independent contractors. Thus the Court declines to grant either party's motion for summary judgment.

## VI. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [Doc. 43] is DENIED, and Defendant's Motion for Summary Judgment [Doc. 48] is also DENIED.

SO ORDERED, this  14  day of August, 2015.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE